IN THE UNITED STATES DISTRICT COURT
OF NEW MEXICO

Barbara Andersen )
      Plaintiff )    Case 20-cv- 00553-JFR
v. )
Unknown Defendant )
      Defendant )

## **VERIFIED AMENDED COMPLAINT**

    Barbara Andersen, as her own attorney, files this amended verified complaint for against Unknown Defendant.  In support of her complaint, Andersen states as follows.

    1.    Andersen is currently a resident of Chicago, Cook County, Illinois.  Andersen is a licensed attorney in good standing since 1998.  Andersen was a former partner at a large national law firm in Chicago until the recession.  Andersen has since practiced at a smaller firm and, later, under her own law firm.  Andersen's law practice was/is mostly focused on real estate litigation in Illinois state court; Andersen's specialized area was title insurance, lien priority disputes and fraud litigation. Andersen has had a few cases in federal court; however, state court is mainly where she has practiced in her career.

    2.    Forrest Fenn ("Fenn") was a resident of Santa Fe, New Mexico.  Counsel for Fenn has advised this Court that Fenn is deceased in this Court's record. [Dkt. 21][1]  While Andersen does not seek relief against the decedent's estate and/or heirs of Fenn in this amended complaint, Andersen reserves the right to seek such relief at a potential future date.  Specifically, in the event that the Finder claims that the decedent estate/heirs of Fenn are in current possession of the treasure chest, Andersen reserves her right to pursue potential, unknown claims against same if necessary and appropriate.   At this stage, it is premature to articulate such claims given that relevant, unknown facts exist as to the find, retrieval, and current location of the treasure chest.

---

[1]    Andersen accepts the representations of Fenn's former counsel as true under F.R.Civ.P. 11.  Andersen attempted to independently verify same through the Santa Fe County records; however, this information was not available to the public except family.

3.     Unknown Defendant's current residence is not known.  Andersen will be seeking this information in this litigation.

4.     Andersen seeks relief for monetary and injunctive relief against the Unknown Defendant pursuant to 18 U.S.C. § 1030(g).  As such, this Court has subject matter jurisdiction under  28 U.S.C. § 1331 given that this matter involves a federal question.

5.     This Court also has personal jurisidiction to hear this matter.  First, the Unknown Defendant purposefully directed his activities in this forum.  Here, the Unknown Defendant is defined as the finder and/or retriever and/or possessor of the treasure.  In this regard, the Unknown Defendant purposefully directed his activities in this forum by (a) using the solve of Andersen relative to the puzzle/poem of the Thrill of the Chase; (b) bringing the treasure to Forrest Fenn in New Mexico upon retrieval.

6.     In addition, this Court has personal jurisdiction given that the claim arises out of defendant's forum-related activities, specifically hacking and stalking of Andersen and her solving of the poem and searching of New Mexico.

7.     In addition, the exercise of personal jurisdiction over this matter is reasonable given that this is the state in which Fenn created the poem and launched the search for same. Further, New Mexico is where the decedent's estate of Fenn possesses discovery relative to the hiding/finding/retrieval of the treasure chest.  In addition, counsel for Fenn has argued that in the Erskine v. Fenn case, 3:20-cv-08123, pending in Arizona that New Mexico is the proper place of personal jurisdiction.  In addition, in the event that it is discovered the Unknown Defendant tendered possession of the treasure chest to Mr. Fenn, the treasure chest may be currently located in the State of New Mexico.  At this juncture, counsel for Mr. Fenn has been evasive relative to answering this question.

8.     At all relevant times herein, Andersen was primarily searching for the treasure chest in New Mexico pursuant to the clues and hints relative to the poem/puzzle created by Forrest Fenn in the book entitled "The Thrill of the Chase" and related publications. Also, the solve to the puzzle/poem is centered in New Mexico.  As such, venue and personal jurisdiction are proper in the District of New Mexico because a substantial part of the events giving rise to Andersen's claims occurred within the District of New Mexico pursuant to 28 U.S.C. § 1391(b)(2)[2].

**Background Facts**

9.     Andersen participated in a treasure hunt drafted by Fenn.  To the best of Andersen's recollection, Andersen first heard about the poem/puzzle in 2017 while she was dealing with the stress of litigation with her ex-husband, a wealthy Illinois physician. Specifically, Andersen had just gotten done dealing in defending a frivolous criminal matter that was instigated by her ex-husband and his divorce attorney as a custody ploy; while Andersen ultimately got the charges thrown out at trial without the need to put on a defense (because Andersen's ex-husband was a fake victim), Andersen had been subjected to years of litigation and costs both relative to the criminal matter and the custody matter.   The custody litigation is still ongoing to date.  It has been very tiring and harassing against Andersen.

10.     In 2017, Andersen was just beginning efforts to go after her ex-husband and the police (Village of Glenview, Illinois) for the filing the false charges and harassing her with the criminal litigation as well as their conduct within the criminal litigation itself.  It was in 2017 that Andersen filed her false arrest litigation in Illinois state court that was thereinafter removed to

---

[2]     Personal jurisdiction may also be proper based on the residency of the Unknown Defendant.  Again, however, counsel for Mr. Fenn has been obstructionist in providing this information.

the Northern District of Illinois.   One of the claims that Andersen sought to pursue was a *Monell* claim relative to the systemic, problematic conduct of the Glenview Police Department.

11.     When Andersen first learned of the search, Andersen did not buy the book at first. Rather, Andersen read the blogs ( http://mysteriouswritings.com/ and https://dalneitzel.com/) without buying the books.  Andersen surmised that Fenn hid himself in the blogs posting additional hints; Andersen believes that she was correct in her belief.

12.     After reading the blogs, Andersen wrote a quick e-mail to Fenn in 2017.  For the most part, except from recent months, Andersen did not retain her e-mails to Fenn.   For Andersen, the hunt was never something that she intended to bring to litigation.  Rather, this event was supposed to be her break from it and hopefully an escape from the tiring legal profession.

13.     To the best of her recollection, Andersen's first e-mail was just a quick note thanking Fenn for the fun idea and, further, that Andersen was using same as an outlet from her legal work and a stressful situation.  To the best of her recollection, Andersen did not mention the specifics of what she was dealing with in her e-mail communications with Fenn.

14.     In response to her e-mail, Fenn wrote back within a very short time period and teased Andersen.  It was a very nice, funny introduction that was going to lead to years of teasing/pranking between Andersen and Fenn.

15.     Upon information and belief, it was around January or February of 2018 when Andersen had a breakthrough on reading the blogs.  Suspecting that Fenn was playing a character on the DalNeitzel blog, Andersen wrote Fenn asking for that person's contact information to tease Fenn.  Fenn did not respond to Andersen's e-mail.  However, while Andersen did not realize it at the time, Fenn indirectly responded to Andersen by posting on the Mysterious

Writing website that he had a "gut feeling" that the treasure chest would be found that year (2018).  In part, because Fenn was known to not give personal hints, Fenn started giving subtle messages to Andersen and the community that someone was on to him and the solve.  See http://mysteriouswritings.com/six-questions-with-forrest-fenn-and-the-thrill-of-the-chase-treasure-hunt-double-charmed/

16.      At this time, Andersen got excited about her potential to solve the puzzle and ordered the books.  In March 2018, immediately prior to her first trip, Andersen ordered the first two books hoping that they would help give her the key to honing in on the precise area of the treasure chest location.  After reading the Thrill of the Chase (having already extensively read the blogs for at least a half of a year), Andersen found the "key"[3] to unlocking the puzzle and approximately two the clues.  In March 2018, Andersen believed that she had bypassed the first eight clues and hit the 9th clue by reverse engineering the poem so to speak.  Andersen then left for New Mexico without telling Fenn in order to surprise him for her first trip in late March 2018.  (In retrospect, Andersen believes that she figured out the eighth clue prior to leaving for New Mexico.)

17.      In addition, in early March 2018, Andersen got a series of anonymous e-mails from a "Sand Sanders" relative to her *Monell* claims in her false arrest case and addressing how the current Chief of police for the Village of Glenview was involved in a perjury scandal called "Bambigate" that ultimately led to his termination in Rockford, Illinois.  Andersen suspected that "Sand Sanders" was Fenn or someone who worked for Fenn given that (a) no one else would have cared about Andersen to initiate such detailed research; (b) "Sand Sanders" relates to the sandy, desolate search area that is also alluded to in the Thrill of the Chase's reference to Second

---

[3]      The "key" to unlocking the puzzle is actually an example of a slight of hand by Fenn.  Andersen will explain same in an *in camera* hearing if allowed.

Fig by Edna St. Vincent Millay.   See https://www.youtube.com/watch?v=2QflTxYsAWg   A copy of one of the e-mails by "Sand Sanders" relative to Andersen's *Monell* claim by "Sand Sanders"[4] is attached hereto as Exhibit A and is incorporated herein by reference.   At this point, Andersen suspected that Fenn had retained a private investigator relative to Andersen.

18.     When Andersen left for New Mexico on her first trip in late March 2018, Andersen then started sending e-mails to Fenn.   Her first was from the Amtrak train station in Chicago to let him know generally where she was going….namely New Mexico.   At the time, Andersen used props with pictures on same as to how she came to her conclusion.   Once in the area, Andersen then took pictures and would e-mail Fenn with same.   She then started to divulge that she believed that she knew the end of the solve/poem location.   Andersen did, in fact, happen across a key spot on this first trip.   Andersen will advise this Court as to what she found in an *in camera* hearing if allowed.

19.     From 2018, Andersen would communicate either publicly on the blogs or through e-mails.   Fenn never responded substantively to any of Andersen's e-mails. It took until October 2019 for Andersen to finally figure out where to go from the key spot that she discovered in March 2018.   Andersen drove and hiked to multiple locations in this time frame to take pictures relative to the clues and explore.

20.     After Andersen's return from New Mexico in early April, Fenn indirectly teased Andersen by giving an interview with Amtrak magazine talking about a "law student" and  "his" e-mail:

> Fenn recently received an email from a law student, who was only just learning of Fenn's treasure. He thanked Fenn "for reminding me of a part of who I am that has waned greatly during the last years of my legal studies. I have had the opportunity to live abroad and travel widely. But

---

[4]      Andersen often teased Fenn about his absurd and funny sandy/dry choice for his solve location.

now, after law school—a black hole of creativity and childish adventure—
I feel old and defeated much more often than I should."

Fenn responded with an impassioned plea that offered more clues to his
real intentions than any of the secrets hidden in his poem. He told the man,
"Don't you dare work as a lawyer," even if that career brings financial
security. "If you do, you will wear a coat and tie, sit at a desk all day,"
Fenn wrote. "You will not have time to smell the sky or experience the
soft breeze ripe with sun. Go looking for my chest full of gold and all of
the other treasures that lurk once you leave the florescent lights behind."

21.     The above and his writings on Mysterious Writings and DalNeitzel's site (called
"scrapbooks") was Fenn's way of encouraging Andersen after her initial Spring 2018 trip.  This
is also when Fenn amended his third book "Once Upon Awhile" and included the "Dizzy" Dean
story.   See  https://dalneitzel.com/2018/06/21/scrapbook-one-hundred-eighty-eight/   After this,
the above blogs started going crazy that someone was close.

22.     At some point in this 2018 time frame, Andersen joined the Mysterious Writing
blog under the name "Willowtree".  At the time, she did not research it relative to the hunt,
Andersen chose the name because it from her it was a "forest" name that was the opposite of the
corporate greed that she had experienced in a case that she brought against Zillow.  For the most
part, Andersen was just an observer on that blog for quite awhile.  Andersen was watching for
Fenn to pop up in one of his hidden characters again.

23.     And he did.  It was at this point in time that Andersen came out of hiding and
started chatting with Fenn publically.  After Andersen's May trip (which she did not give
advance notice to Fenn), Andersen found out on the Mysterious Writing blog that she was being
filmed.  Andersen went to go look for these postings; for unknown reasons, the blog postings
have been deleted.  Andersen will request same in discovery herein.

24.     Specifically, because she did not pre-announce her arrival, a stranger drove up to this remote area.  Andersen believes that this was one of Fenn's camera people who had not prepared for Andersen's unannounced arrival.

25.     When Andersen returned home after this May 2018 trip, Andersen found out that she was in fact being filmed because Fenn (in a hidden character) started teasing Andersen about her eating cheetos and other embarrassing/funny matters relative to her March/May 2018 searching.   There was also a suggestion that some beer drinking local people had followed Andersen and/or searched after Andersen left.   Fenn posted a funny video similar to this https://www.youtube.com/watch?v=0VOe5VBNXpc on Mysterious Writing to assure Andersen that the beer drinking "fish"[5] who had followed Andersen were unsuccessful in their cheating.

26.     After this May 2018 incident, Andersen became very protective of her searching/solve progress.

27.     Between May 2018 and October 2019, Andersen then went back to solve the balance of the poem and figure out the second stage of the solve.   Andersen also then figured out what clue she had missed in the area that she had happened across in her late March 2018 trip.

28.     Andersen will not address the clues/answers so as to not educate Unknown Defendant.  Andersen will also not disclose what she found in March 2018 so as to not educate the Unknown Defendant.

29.     After finding the general location, Andersen incurred substantial monies and time (months each year) physically looking for the treasure.  During that time period, Andersen never saw any searcher.  The road that is closest to Andersen's primary search location is very poorly maintained and is largely avoided except by local residents.  Andersen would camp or stay with local residents during her lengthy search trips from March 2018 until June 2020.

---

[5]     Fishing is a theme through the relevant books.

30.     Over the years, in addition to the above, Fenn quietly acknowledged Andersen as the solver of the poem/puzzle.   Sample references can be found in his Rooster Cogburn scrapbook, his reference to Bohemian (Andersen is Czech), his reference to "doctor/lawyer" (Andersen's ex-husband is a doctor), his reference to "barb" in a scrapbook, his reference to a boa (Andersen wore one in an old law firm photo), his reference to a mom searcher and several other examples.   Further, Fenn is fully aware that Andersen was the actual solver of the poem and has been so for some time while attempting to find the precise spot.

31.     Fenn has likely hundreds of e-mails from Andersen, including photographs relative to almost all of the nine of the clues/answers as well as relative to finding the physical location.   Conversely, upon information and belief, Unknown Defendant came out of "left field" with his solve that he stole from Andersen and has sparse, substantive communications to Fenn.

**The "Wyoming" Solve**

32.     In early June 2020, Fenn announced that the treasure had been found under a "canopy of stars".   https://dalneitzel.com/2020/07/22/15/    Andersen believes that Fenn's reference to the treasure being found under a  "canopy of stars" reference relates to her and her solve.  The canopy of stars was a tipi prepared by Andersen's sister that contained funny pictures relative to the solve and Andersen's adventures/jokes.   Again, Andersen will explain the significance in an in camera hearing if allowed.  Andersen took multiple pictures of this tipi in her April 2020 trip, her May 2020 stop in Wyoming and her May/June 2020 searching in her final search area.

33.     In addition, after the initial June 2020 "find" announcement by Fenn, Fenn (who is known to tease, lie and prank) began to unravel.  First, the blogs began discussing how the pictures of the "found" chest were manipulated and photo shopped.  Second, one of the pictures

photo shopped in the chest related to Andersen's travelling in May 2020 to Mount Rushmore (where Andersen took funny pictures for Fenn on her way to New Mexico on her May/June 2020 trip).  https://www.youtube.com/watch?v=BB2y72eRwIU&t=200s   Third, a blurred picture of Andersen and her dog, Cupcake, seem to appear in the photo shopped images of the "found" chest. Copies of the picture with markings by Andersen is attached hereto as Exhibit B and C and are incorporated herein by reference. Fourth a purported willow branch appears in the chest. Fifth, the scissors in the discovered chest had two potential meanings at Andersen's final search area.  Again, Andersen will explain this last point in an *in camera* hearing if allowed by this Court.

34.     To date, Andersen has made multiple requests to Fenn and his counsel to (a) clarify if the solve location is the same as the "find" location; (b) disclose whether more than one treasure has been hidden; (c) to disclose whether he was just pranking and engaging in word play by saying that he and the Finder "agreed that we should reveal that the treasure was found in Wyoming"[6] (as opposed to saying that the solve of the poem was in fact in Wyoming) or, alternatively, that the treasure was actually hidden at the solve location (as opposed to being hidden at his personal property in a location not connected to the solve location); (d) to disavow Andersen's solve and clear evidence of same; and (e) to provide a verified statement to Andersen and this Court disavowing Andersen's solve.  Fenn and his counsel evaded Andersen's numerous inquiries.   A true and correct copy of one of Andersen's correspondence with Fenn and his counsel is attached hereto as Exhibit D and is incorporated herein by reference.

---

[6]     In one of her e-mails to Fenn from the Spring of 2020, Andersen had joked that the YouTubers were constantly discussing Wyoming and sending their viewers astray.  Andersen joked that even the people near Andersen's search area were heading up to Yellowstone by listening to these YouTubers rather than by trying to solve the poem and listen only to Fenn. Andersen believes that the Wyoming "find" announcement stems from this joke.

35.     In addition, almost immediately after Andersen confronted Fenn and his counsel with Fenn's Wyoming[7] announcement, Fenn then released an e-mail stating that interest was growing in "Cody".   See https://www.hintofriches.com/forum/the-hint-of-riches/191847-new-quote-by-f-thoughts/page12 Upon information and belief, this was another way of Fenn teasing Andersen.   Upon information and belief, Fenn was not referring to Cody, Wyoming.   Rather, Fenn was referring to an area within Andersen's search area where Andersen had begun digging (and was also tied to the scissors and a strange website picture that Andersen will show this Court *in camera* if allowed).   Cody is not a city location, but a second reference to one of the clues that is repeated in the final search area/solve location area.

36.     As such, Andersen is confident in her solve and her solve location.   Assuming that there is only one treasure location, Andersen believes that she has rightfully earned "title" to the treasure chest.    The books' clues (and one is particularly blatant) refer precisely to where Andersen was searching.   Indeed, after October 2019, Fenn gave multiple hints to the public to confirm to Andersen that she was correct and to give them a final chance to catch up; Fenn even repeated the most blatant hint in a November 2019 interview.   Despite same, Andersen never saw a single person searching for Fenn's treasure through and until the June 2020 announcement.

**The Unknown Defendant**

37.     Andersen started hearing from the Unknown Defendant at some point in time after she moved into her condo in Chicago.   Andersen purchased same in October 2018. Andersen will need to secure her phone records relative to same.   As in May 2020, Andersen initially attempted to block the Unknown Defendant; but given that he was using a pranking app, this was impossible.

---

[7]      Wyoming (which is discussed in the books) is relevant to Andersen's searching. Andersen will address same *in camera* if allowed.

38.     Andersen never felt threatened by the Unknown Defendant (whom she now jokingly calls "Joe Stalker").   Even though he told Andersen that she was being watched, Joe Stalker was funny. Andersen had originally thought that the Unknown Defendant was Fenn or an employee pranking Andersen in a different fashion.   Despite her suspicion, Andersen never discussed the "Chase" with the Unknown Defendant.

39.     Andersen did not save these 2019 texts because she considered them mostly as nonsense, funny and not threatening and had nothing to do with the "Chase".

40.     On one of these early 2019 texting occasions, the Unknown Defendant advised Andersen that he has researched one of her litigation matters and had found information relative to her opposing counsel.   This case related to a fraudulent conveyance of a judgment debtor's assets.   The Unknown Defendant told Andersen that he had found information about her opposing counsel (who was also personally a defendant in an unrelated fraudulent conveyance case in the Northern District of Illinois) and his hiding of his own personal assets.   This comment again led to Andersen suspecting that the Unknown Defendant was Fenn or someone who worked for him.   To the best of her recollection Andersen would say that this occurred some time between October 2018 and the Spring of 2019.   Again, Andersen will need to see if her phone records reflect the dates relative to this texting.

41.     The Unknown Defendant also told Andersen that he had her bugged and was monitoring her activities.   At the time, Andersen just brushed it off thinking that Fenn was having Andersen investigated to make sure that she was a nice person.

42.     Then in approximately the summer of 2019, the Unknown Defendant disappeared until May 2020 when Andersen reached New Mexico for her most recent, pre-announcement

searching trip.  Again, as shown in Exhibit E and is incorporated herein by reference, Andersen attempted to block the Unknown Defendant.

43.     At first, the Unknown Defendant denied being the same person as in 2019. However, he then let little things "slip" which reminded Andersen of his prior 2019 communications.  Again, even though she suspected Fenn or someone who worked for him, she never discussed the Chase in the event that it was not.  During her camping, the Unknown Defendant again alluded that Andersen was being watched.  As she had done before, Andersen ignored the Unknown Defendant's text as nothing more than funny and/or just nonsense. Andersen never felt physically threatened by the Unknown Defendant.  Before the "find" announcement, Andersen still suspected that it could be Fenn or one of his employees pranking Andersen to keep her cheerful during her lonely camping time.

44.     Andersen was camping in her car when the "found" announcement was made by Fenn in early June 2020.  She then drove to Fenn's home expecting to see media.  No one was there.  For the first time in her history with Fenn, Andersen called Fenn.

45.     Fenn advised Andersen that he did not want to discuss the matter with Andersen, that the Chase was over and that she could call back the next day.  Andersen then returned to her search area, camped overnight in her car and went to inspect her area at the break of dawn the next day.  Andersen took pictures and video of same.  Andersen did not readily see anything out of place; however, she had not taken pictures immediately prior the announcement in any detail. Andersen will be requesting the hiding/find pictures (and not just the photo shopped versions) in discovery herein.

46.     The next day, Fenn repeated that he did not want company due to the virus and/or to discuss the matter with Andersen.  After approximately a week of waiting, Andersen finally

returned back to Chicago.  That was when Andersen saw and learned that the find photographs were fake and, further, that Fenn was oddly meeting with the "Finder" outside of his home at an unknown office and not wearing a mask.  Andersen waited for Fenn to confess as to his pranking relative to the "finding" of the treasure.  That still has not occurred to date.

47.     In addition, after Andersen searched and photographed her area the morning after the "find" announcement, Andersen returned to Santa Fe.  On her way, she reported the matter to the local police. Upon information and belief, the police did not do anything with Andersen's complaint.   At this point in time, Andersen is not interested in pursuing criminal remedies against the Unknown Defendant.

48.     Andersen also send the Unknown Defendant a text confronting him about the purported "find".   That is when the Unknown Defendant admitted that he knew about Andersen's search activities.  One example is that he knew that Andersen wore costumes and took silly photographs.[8]  Only Fenn knew that from Andersen's e-mail correspondence.    A true and correct copy of his text message is attached hereto as Exhibit F and is incorporated herein by reference.  In addition, the Unknown Defendant's reference to "Michael Haas" in Exhibit F is a reference to a small claims case that Andersen had relative to a Chicago locksmith who stole Andersen's deposit; the Unknown Defendant would only have found this after extensive digging

---

[8]     The solve is a fantasy solve.  Once Andersen realized that she was on camera being watched/laughed at,  Andersen joked that she was like "Gene Gene the dancing machine on the Gong Show"  https://www.youtube.com/watch?v=xuJHKVQ2kLA  in the funny things that she had to do while searching.   Once she realized that she was on film and being laughed at, Andersen joined in the fun by taking funny pictures in costumes. Andersen hoped that should she find the treasure, she or Fenn would write a story for kids about her crazy adventure.

Also, one of Fenn's quotes is that imagination is more important than "knowlege" [sic]. This quote has at least two purposes: (a) to let the reader know that they will need to do a fantasy/abstract solve and (b) the missing "d" is a hint.  (Fenn also misspells his friend, Edward, as "Edard" in the book.  (Again, Andersen will explain same in an *in camera* hearing if allowed.)

into Andersen's computer files and/or on the internet records of the Circuit Court of Cook County.

49.     In addition, although Andersen inadvertently lost the text when she changed phone companies recently, the Unknown Defendant also made a reference to "Bonnie and Clyde" in post-announcement text.  "Bonnie and Clyde" was a nickname that Andersen gave to two local residents who had become a potential danger to Andersen and the other local residents. Again, only Fenn would have known this fact from Andersen's e-mail communications. ("Clyde" is the nickname of the person listed in the police report that Andersen previously filed in this matter.  He was a former felon and appeared to be a drug addict; he threatened violence in the local community and attempted to intimidate Andersen on a few occasions.)

50.     The text messages attached as Exhibit F also show that the Unknown Defendant had no substantive understanding as to how to find the physical location of the treasure from the last clue/answer.

51.     Upon information and belief, based on Exhibit F, Unknown Defendant has no substantive as to the actual solve of the poem.  Conversely, upon information and belief, Andersen has solved all nine clues based on what Forrest Fenn has implied in blog postings/Scrapbooks.

52.     After the announcement that Fenn had passed, Andersen received numerous communications from Fenn's counsel relative to this litigation.  Andersen thought that was odd and suspect in light of the fact that it had just been announced.  Andersen suspected that perhaps the announcement of Fenn's passing was another prank.

53.     Approximately a week ago, Andersen sent the Unknown Defendant a text and the Unknown Defendant responded.  Then Fenn's counsel filed Dkt. 21 and, further, Fenn's family

members posted comments on social media about Fenn's passing.  As such, Andersen has no

reason to question Docket 21 and/or Fenn's counsel's representations to this Court.  As such, the

question still remains: who is Joe?

54.    In the past week or so, Andersen was told that (amazingly if in fact true) the

Unknown Defendant also inadvertently captured potential recordings/evidence of criminal

misconduct relative to her custody case.  A copy of one of the text message is attached hereto as

Exhibit G (from September 16, 2020) and is incorporated herein by reference. If true, this

information should be tendered to Andersen and/or the United States Attorney General for

investigation/prosecution.   Likewise, if a private investigator of Fenn also has any such

information, Andersen would ask that this Court assist her in securing same.

55.    Andersen is not pranking herself.  Andersen also has not asked any friend, family

member or acquaintance to text her.  Andersen will use discovery in this litigation to try and

trace the source of the text messages if possible.

56.    Upon information and belief, Unknown Defendant stole Andersen's solve by (a)

hacking her computer and/or e-mails (i.e. those to Fenn) and (b) physically stalking Andersen

once she arrived for her final searches.

57.    Andersen has repeatedly asked Fenn and his counsel to correct Andersen and to

educate her as to who "Joe".  Again, Fenn and his counsel have evaded Andersen to date.

**COMPLAINT FOR INJUNCTION AND MONETARY RELIEF AGAINST
UNKNOWN DEFENDANT PURSUANT TO 18 U.S.C. § 1030(g)**

58.    Andersen incorporates paragraphs 1 through 57 as paragraph 58 herein by

reference.

59.    At all times relevant hereto, there existed the Computer Fraud and Abuse Act, 18

U.S.C. §1030 that prohibits the unauthorized accessing of protected computers with the intent to

either obtain information, further a fraud or damage a computer and its data. 18 U.S.C. § 1030(g) allows for private persons who have been damaged in excess of $5,000 or more to seek monetary and/or injunctive relief pursuant to same. 18 U.S.C. § 1030(g) states as follows:

> (g)Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses [5] (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage. No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.

18 U.S.C. § 1030(g).

60.    Andersen's computer and her e-mail communications to Forrest Fenn fall within the definition of a protected computer for purposes of the Computer Fraud and Abuse Act.

61.    Upon information and belief, Unknown Defendant found the precise location of the Forrest Fenn treasure not because he solved the puzzle, but because he/ intentionally hacked Andersen's computer and e-mails in violation of the Computer Fraud and Abuse Act and, further, stalked Andersen physically at the treasure location site.

62.    Upon information and belief, Unknown Defendant damaged Andersen by stealing her proprietary information relative to the solve of the Forrest Fenn poem/puzzle and the physical location of the treasure chest.  Unknown Defendant intended to damage Andersen by stealing her proprietary information and using same to reach the treasure first.

63.     Upon information and belief, Unknown Defendant secured the location of the treasure by unethical and illegal means and should be barred from having any right or title in the treasure.

64.     Upon information and belief, but for the improper conduct of Unknown Defendant, Andersen would have located the treasure given that she was focused on a very small area at this late, multi-year juncture of the search.

65.     To date, neither Fenn nor his counsel: (a) have publicly disclosed the Finder; (b) have given a credible solve to Andersen or the public; (c) have responded to Andersen's challenge to the find announcement and suspect details; (d) have disavowed Andersen's solve; (e) have offered Andersen a direct explanation as to why the Chase concluded and/or why she is being left in the dark in light of her correct solve; and (f) have advised Andersen who "Joe" is if not the Unknown Defendant in any verified fashion.  The conduct of Fenn and his counsel has been evasive, obstructionist and suspect to date.

66.     Upon information and belief, the value of the chest and its contents is millions of dollars if sold/auctioned.

67.     Wherefore, Andersen requests that this Court take the following relief:

(a)     To order discovery from the Unknown Defendant and Fenn's heirs and counsel as to the identity and contact information of the purported Finder/Unknown Defendant; the current location of the chest; the explanation for their evasiveness with Andersen; all research relative to Andersen, including all audio/video recordings which may contain criminal activities relative to her custody case; the information relative to the hiding and finding of the chest, including un-doctored photographs and videos; all communications with the alleged Finder; the solve; all video footage of Andersen in New Mexico; and an explanation as to whether there is a basis for

confusion (i.e. two versus one chest) if any and why that was not disclosed to Andersen without needing to resort to litigation;

(b)     To compel counsel for Fenn to explain the above in a Zoom status *in camera* hearing;

(c)     To order an *in camera* hearing with Andersen to better understand the solve;

(d)     To order discovery relative to the third party blog sites, including but not limited to the above;

(e)     To order discovery relative to the phone number behind the pranking app;

(f)     To enjoin the Unknown Defendant from selling and/or auctioning the treasure;

(g)     To order the Unknown Defendant to turn over the treasure chest to Andersen;

(h)     To order monetary damages for any of the assets removed from the treasure chest; and

(i)     To order costs against the Unknown Defendants associated with this litigation.

Barbara Andersen

\_\_\_/s/ Barbara Andersen_____

Barbara Andersen, 6256000
1220 West Sherwin, Unit 1E
Chicago, IL 60626
(708) 805-1123
bandersen@andersen-law.com

VERIFICATION

1.      I, Barbara Andersen, verify that I personally prepared the above complaint.  If called to testify, I would testify as contained therein.

2.      I have personal knowledge of the allegations contained in the above, verified complaint except for when plead "upon information and belief", "to the best of my recollection" or other commentary to that effect.

3.      I verify the complaint under penalty of perjury that the statements contained therein are true and correct.


/s/ Barbara Andersen, plaintiff and attorney
September 17, 2020